# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

SHADEED BARNETT,
    Petitioner,

vs.

WARDEN, CHILLICOTHE
CORRECTIONAL INSTITUTION,
    Respondent.

Civil Action No. 1:09-cv-693

Dlott, C.J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

    Petitioner, who is in state custody at the Chillicothe Correctional Institution in Chillicothe,

Ohio, has filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter

is before the Court on the petition (Doc. 1); respondent's "Answer/Return Of Writ" with exhibits,

including the trial transcript (Doc. 7); and petitioner's reply to the return of writ. (Doc. 19).

## I. PROCEDURAL HISTORY

### State Court Proceedings

    On November 15, 2007, the Butler County, Ohio, grand jury returned a six-count indictment

against petitioner and three other persons; petitioner was charged in Count Four with felonious

assault in violation of Ohio Rev. Code § 2903.11(A)(2) and two firearm specifications. (Doc. 7, Ex.

1). After a jury trial, petitioner was found guilty on the felonious assault charge and one of the

firearm specifications. In its direct appeal decision, the Ohio Court of Appeals, Twelfth Appellate

District, provided the following summary of the facts that led to the indictment and petitioner's

conviction and sentence:[1]

> Appellant was indicted ... on one count of felonious assault with two firearm specifications (brandishing a firearm and possessing an automatic firearm) for his role in a shootout that occurred in a Middletown, Ohio housing complex ("the projects," as referred to in the testimony of several witnesses) near Main and Lafayette Streets. The state alleged that in the early morning hours of September 19, 2007, appellant along with Gabriel Tyrone Smith, Teray D. Marshall, Jr., and Terry Fuller, opened fire in the projects, riddling the neighborhood with bullets and injuring several people, including Demarco Conley (shot in the stomach), Jeremy McGuire (shot in the hand), Jerrel Wright, and Deontae Robinson (both shot in the leg). Demarco underwent numerous surgeries for his gunshot wound to the stomach and was still hospitalized at the time of the trial.
>
> On February 11-15, 2008, appellant was jointly tried with Gabriel Tyrone Smith, Teray D. Marshall, Jr., and Terry Fuller. Appellant did not testify or present evidence on his behalf. Due to his serious, life-threatening injuries, Demarco was unable to physically testify at trial; a videotaped deposition of his testimony was instead played to the jury. Testimony at trial revealed the following facts:
>
> In the early morning hours of September 19, 2007, Demarco was at a bar with his girlfriend, Lori Glover, and his best friend, Jeremy McGuire. According to Demarco, present at the bar were Teray D. Marshall, Jr., Gabriel Tyrone Smith ("Tyrone"), and Terry Fuller. Demarco did not remember seeing appellant at the bar. Lori and Jeremy saw Tyrone and Terry at the bar but did not see appellant (or were not sure if they were there). Terry was wearing orange. While at the bar, Demarco got into a fight with Brandon Smiley, a friend of Teray. After the fight, Lori drove to the projects with Demarco and Jeremy and dropped them off. It was Demarco's intention to recruit friends to go finish the fight with Brandon.
>
> An aerial view of the projects shows that it is comprised of three parallel streets: Cribbs Street to the north, Weaver Street to the south, and McGuire Street between the two; running perpendicular to these streets are Main Street to the east and Vance Street to the west. Of importance to the case is a grassy area that is a joint backyard for apartment buildings on McGuire and Weaver Streets.
>
> At the projects, Demarco and Jeremy met up with D[ometrice] Davis (Lori's

---

[1]28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless petitioner rebuts the presumption by "clear and convincing evidence." Because petitioner has neither cited nor presented clear and convincing evidence to rebut the Ohio Court of Appeals' factual findings quoted herein, the state appellate court's factual findings are presumed to be correct. *See McAdoo v. Elo,* 365 F.3d 487, 493-94 (6th Cir.), *cert. denied,* 543 U.S. 892 (2004).

brother), James Wilson, Jerrel Wright (Demarco's cousin), and Zeph Jennings. D[ometrice] and Zeph lived on Weaver Street, Jerrel on McGuire Street. As the group was getting together, D[ometrice], James, Jeremy and Zeph noticed a blue Ford Taurus with dark tinted windows on Weaver Street driving around the projects. Jeremy and Zeph did not see who was driving the Taurus. By contrast, D[ometrice] and James both testified that Tyrone was driving the Taurus. James further testified that his sister, Cierra Wilson, was a passenger in the Taurus. Cierra testified Tyrone was driving the Taurus in which she was a passenger.

After dropping off Demarco and Jeremy, and as she was driving south on Main Street, Lori noticed that Tyrone was following her in a blue Taurus. Lori eventually pulled over and the two briefly conversed from their cars. Lori did not see anybody else in the Taurus. During their conversation, Tyrone received a phone call. Tyrone told the caller "that's all you got to say. I'm on my way," then left and drove away towards the projects. Lori does not know who the caller was.

Meanwhile, in the projects, Demarco and his friends were on McGuire Street when they ran into D'Angela (James' cousin) who was crying because her boyfriend, Deontae Robinson, had beaten her up. Upon seeing Deontae walking down the street, James, along with Jeremy and Demarco, beat up Deontae. Either during the beating or immediately after, D[ometrice] observed a silver Nissan vehicle drive on McGuire Street before turning on Vance Street. In the Nissan vehicle were appellant, Teray, and a third person wearing an orange shirt. Appellant was driving the car; Teray was in the front passenger seat. Appellant was wearing black; Teray did not have a hat or a jacket.

Soon after, gunfire erupted. D[ometrice] testified that Teray came around the corner from Vance Street and started shooting while walking down McGuire Street. James testified that Teray came around the corner from Vance Street with two other persons, stated: "I see you all bitch ass n***s," and started shooting. James could not tell who the other two persons were. By the look or the way it was shooting rapidly, D[ometrice] and James believed Teray was using an automatic weapon. Jerrel testified that the shooting started on McGuire Street near Vance Street; thereafter, it was coming from everywhere. By the sound of the gunfire, Jerrel believed automatic weapons were used. Before the shooting started, Zeph heard someone scream out of a car "I see you all n***s." Demarco heard someone yelling "there they go," followed by a "bunch" of automatic gunfire. Demarco did not know who started the gunfire, or where or why it started.

As gunfire erupted, Demarco and his friends scattered and took off running. D[ometrice] took off running towards Main Street with the intention to retreat into the woods to the east of Main Street. He was in the grassy area between McGuire and Weaver Streets when he saw the Taurus come around; the front passenger

3

window rolled down; shots were fired from the car. D[ometrice] retreated and hid behind a shed until he heard the Taurus leave. He then ran across Main Street to safety. Shooting was still going on after he had crossed Main Street. D[ometrice] observed the Taurus driving south on Main Street.

The record indicates D[ometrice] saw appellant twice during the shootout. Once was when D[ometrice] was hiding behind the shed; at that time, appellant was in the grassy area. D[ometrice] did not see appellant with a weapon. It is not clear from the trial transcript when D[ometrice] saw appellant the other time.

Zeph took off running through the grassy area towards Main Street. However, the Taurus came around and shots were fired from the car. Zeph retreated; as he was running away from Main Street, he saw Demarco. At that moment, someone in orange started shooting at Zeph who retreated to safety into a house.

Jeremy was shot in his right hand before he took off running. He does not know who shot him. After being shot, Jeremy took off running through the grassy area, ran across Main Street diagonally, and fell behind bushes.

Demarco took off running and hid behind a shed in the grassy area near Main Street. Gunfire and yelling continued. As he was hiding, he saw Jeremy, his best friend, being chased and fired at by two people. Demarco believed the two shooters were appellant and Teray. Jeremy was sprinting towards Main Street. Although the two shooters had already run past him, Demarco came out of hiding and yelled to distract them. The shooters turned towards him and started shooting. Demarco was shot in the stomach in the grassy area near Main Street and fell to the ground. Someone then came to him and smacked him with a gun, stating "You're going to die bitch ass n***." Demarco recognized Teray's voice. Another individual with Teray told Teray "to come on because the police was coming." Demarco did not know if the second voice was appellant's voice. Demarco testified that at that point he was in and out of consciousness. This was confirmed by Officer Ken Minear who testified Demarco was unable to communicate as he was in and out of consciousness. Demarco testified that during the shootout "there was a lot of automatics going off;" more than two shooters were involved as there was too much gunfire to come solely from appellant and Teray.

Jerrel took off running through the grassy area when he saw his cousin Demarco fall. Jerrel started running towards Demarco when someone came around shooting. Jerrel retreated and was running back to his house when he was shot in the leg. Jerrel did not see who shot him and could not identify any of the shooters; all he "saw" were bullets.

James took off running as soon as Teray started shooting, and retreated to the grassy

4

area where he ended up near Jerrel. At the beginning of the shootout, James also observed shots fired from the Taurus; at that time, the Taurus was on Main Street between McGuire and Weaver Streets. While he was in the grassy area, James observed Demarco get shot in that same grassy area near Main Street, fall to the ground, and being subsequently hit with a weapon by Teray who was accompanied by appellant. Appellant then told Teray, "Here come the police. Come on." Thereafter, Jerrel was shot by a shooter wearing an orange shirt. James was with him. After being shot, Jerrel pushed James into an apartment building. James does not know who shot Demarco.

James further testified he saw appellant with a weapon; the weapon was bigger than a handgun; appellant and Teray were shooting when James was in the grassy area; and appellant was running towards Demarco and shooting when Demarco was shot.

Holly Cummings, a resident on McGuire Street, was playing cards that morning when she heard gunfire and people yelling. Looking out her back window into the grassy area, she observed a man with a big weapon walking through the grassy area towards Main Street. The man was wearing a hat and a jacket. The weapon was not a handgun. The man was not firing the weapon but was holding it up in sight.

Lori Griffis, a resident on Weaver Street, was awakened by the shootout. Looking out her front door, she observed a blue Ford Taurus with dark tinted windows on Weaver Street with the back passenger door open. The Taurus was facing west. Griffis heard two men arguing somewhere in the grassy area, with one saying "You're going to do me like that n***;" shots were then fired from the Taurus through the open door into the grassy area. The Taurus then drove "real fast" past her house to the end of the street, drove back to its original location in reverse, and finally drove past her house and turned onto Vance Street. Griffis never saw anyone exit the Taurus. Griffis testified that when the Taurus drove in reverse, she could hear gunfire coming from the grassy area; in fact, a couple of bullets hit her storage shed located in the grassy area.

A police officer trained in weapons as a SWAT team member was on light duty that morning taking 911 calls. The officer testified that they received over 30 calls regarding the shootout and that while talking to callers, he could hear gunfire, both automatic and semi-automatic.

At the scene, the police recovered 26 shell casings from three different calibers, to wit: seven 9 mm shell casings at the corner of Weaver and Main Streets; five .40 caliber shell casings in the grassy area near Vance Street; and 14 7.62x39 shell casings in the grassy area and at the corner of Weaver and Main Streets. The recovered shell casings all appeared to be "fresh" casings. No shell casings were found at the corner of Vance and McGuire Streets. Several bullet strikes and/or holes

5

were found on the ground, telephone poles, and buildings, including a residence on McGuire Street. The crime scene covered three blocks. The weapons used in the shootout were never recovered.

The silver Nissan vehicle was recovered that day; it was parked on Vance Street and was rented to appellant. Although searched, nothing was recovered from the vehicle. The Taurus was found later that day on 17th Avenue. There was no damage to the body of the car or the windows. There were no shell casings in the car; "the interior was very clean." The Taurus was not processed for gun powder residue; a detective testified powder residue tests are no longer considered reliable. A bullet was found lodged inside the top of a rear passenger door of the Taurus. Detective David Swartzel testified the bullet appeared to have been fired from the Taurus (and not at the Taurus).

Teray and Tyrone turned themselves in. Appellant was arrested the day after the shootout. A search of his apartment yielded one .40 caliber bullet, two bullet proof vest carriers without their panels but each with a holster of a different size, and appellant's passport. Neither the holsters nor appellant were checked for gun powder residue.

Chris Monturo of the Miami Valley Regional Crime Laboratory testified he examined the 26 shell casings recovered from the crime scene. According to Monturo, at least four weapons were involved in the shootout: three semi-automatic or automatic weapons and possibly one revolver. The .40 caliber shell casings all came from one gun; as did the 9 mm shell casings. Monturo testified a TEC-9 weapon uses 9 mm bullets, is typically a semi-automatic weapon, but can be converted into an automatic weapon. With regard to the 7.62x39 shell casings, Monturo testified two types of semi-automatic weapons can use those shells: AK-47 and SKS weapons; both weapons can be converted into automatic weapons; however, he could not tell whether the shell casings came from the same weapon. Monturo also could not tell whether the weapons used were semi-automatic or automatic weapons.

Monturo further testified that a bullet recovered from inside a residence on McGuire Street was fired from an AK-47, AKS, or SKS semi-automatic weapon; a bullet recovered from the grassy area was fired from a Beretta Smith-Wesson or a Springfield XD semi-automatic pistol; and the bullet recovered in the Taurus was fired from a revolver.

Following Monturo's testimony and over appellant's objection, the trial court admitted a photograph of appellant showing him wearing a weapon in a holster. Middletown Detective Larry Fultz testified that on the photograph, appellant was "wearing a shoulder-type holster with what appears to be a Tech 9 [sic] with an

6

extended magazine." The detective testified that the photograph was recovered during a search warrant "several years back;" the search warrant was not directed at appellant; he did not know when or where the photograph was taken, who took it, and whether it was taken at a Halloween or costume party; he did not know how old appellant was on the photograph; and he did not know if the weapon displayed on the photograph was a real weapon or an airsoft gun.

On February 15, 2008, the jury found appellant guilty of felonious assault with one firearm specification (brandishing a firearm). Appellant was subsequently sentenced to 11 years in prison....

(Doc. 7, Ex. 16, pp. 1-9).

After petitioner was convicted and sentenced in February 2008, petitioner's trial counsel filed a timely notice of appeal on petitioner's behalf. (Doc. 7, Ex. 13). With the assistance of new counsel for appeal purposes, petitioner filed a brief raising three assignments of error:

1. The trial court erred by permitting the State to use the videotaped deposition of Demarco Conley instead of requiring him to testify in person before the jury.

2. The trial court erred in admitting a photograph of Mr. Barnett in violation of Evidence Rule 403(A).

3. The jury verdict is not supported by sufficient evidence.

(Doc. 7, Ex. 14). On May 11, 2009, the Ohio Court of Appeals issued an Opinion and Judgment Entry overruling the assignments of error and affirming the trial court's judgment. (Doc. 7, Ex. 16).

Petitioner next filed a timely *pro se* appeal to the Ohio Supreme Court. (Doc. 7, Ex. 17). In the memorandum in support of jurisdiction, he asserted as propositions of law the same three claims that he had presented to the Ohio Court of Appeals. (Doc. 7, Ex. 18). On August 26, 2009, the state supreme court declined jurisdiction to hear the case and summarily dismissed the appeal "as not involving any substantial constitutional question." (Doc. 7, Ex. 20).

7

## Federal Habeas Corpus

Petitioner filed the instant habeas corpus petition in September 2009. (Doc. 1). He alleges

the following grounds for relief:

> **GROUND ONE:** THE TRIAL COURT ERRED BY PERMITTING THE STATE
> TO USE THE VIDEOTAPED DEPOSITION OF MR. CONLEY INSTEAD OF
> REQUIRING HIM TO TESTIFY IN PERSON BEFORE THE JURY.
>
> **Supporting Facts:** Where a trial court permits a witness in a criminal case to testify
> by videotaped deposition, and there is no substantial basis to conclude that the
> witness could not have testified in court before the jury, a trial court abuses its
> discretion....
>
> **GROUND TWO:** THE TRIAL COURT ERRED IN ADMITTING A
> PHOTOGRAPH OF MR. BARNETT IN VIOLATION OF EVIDENCE RULE
> 403(A).
>
> **Supporting Facts:** A trial court abuses its discretion under Evidence Rule 403(A)
> where it admits a photograph of the defendant wearing a handgun in a shoulder
> holster, where the prejudicial effect of the photograph on the jury far outweighs any
> minimal probative value that the photograph represents.
>
> **GROUND THREE:** THE JURY VERDICT IS NOT SUPPORTED BY
> SUFFICIENT EVIDENCE.
>
> **Supporting Facts:** Where there is no direct testimony that the defendant shot and
> wounded the victim, where the victim is not sure that the defendant was the person
> who shot him, and where one of the state's witnesses admits that he would lie in
> order to help the victim, a jury's verdict of conviction for Felonious assault is not
> supported by sufficient evidence and should be reversed.

(Doc. 1, pp. 3-4).

## II. OPINION

### A. Petitioner Has Waived The Claim In Ground One Challenging The Admission Of A Videotaped Deposition, Which Was Reviewed For "Plain Error" On Direct Appeal

In Ground One of the petition, petitioner contends that he is entitled to relief because the trial

court erred when it allowed the State to use the videotaped deposition of Demarco Conley at trial in

lieu of the witness's live testimony. (Doc. 1, p. 3). On direct appeal in the state courts, petitioner

claimed that the trial court abused its discretion in admitting the videotaped deposition because the

State failed to show that the witness was unavailable to testify at trial. (Doc. 7, Ex. 14, pp. 3-4; Ex.

18, p. 5).

The Ohio Court of Appeals was the last state court to render a reasoned decision addressing

petitioner's claim. The court made findings of fact, which are presumed correct,[2] and ruled in

relevant part as follows:

> Due to Demarco's serious injuries, his testimony was videotaped on December 5, 2007 (two months before trial) and preserved for trial pursuant to Crim.R. 15. The state moved to use Demarco's deposition at trial in lieu of his live testimony. The motion was supported by an affidavit from Demarco's physician dated January 31, 2008. The affidavit stated that (1) due to the gunshot wound, Demarco's "current condition [was] serious and he still suffer[ed] from life-threatening injuries;" (2) based on the serious nature of his injuries, "the ongoing complications as a result of his injuries," and the "risk of aggravating the injuries due to the potential physical and mental stress," the physician advised against transporting Demarco to court for his live testimony as "any transport could jeopardize his condition;" and (3) it was the physician's "opinion, to a reasonable degree of medical certainty, that Demarco [] will be unable to be present to testify at this trial."

> Five days before trial, a hearing was held regarding the deposition. The state represented that Demarco was suffering from liver failure, his condition was worsening, and as a result, he was going to be transported to a hospital in Pennsylvania within a week. All four defense attorneys objected to the use of the videotaped deposition at trial on the ground it would violate their clients' Sixth Amendment right to confrontation. Appellant's attorney further argued that if Demarco was well enough to be transported to Pennsylvania, he was well enough to be transported to the trial court to testify in person.

> The trial court accepted the state's representation that Demarco was unable to testify at trial because he was too ill; noted that all four defense attorneys were present during Demarco's deposition; and noted that the videotaped deposition would allow the jury to measure Demarco's credibility. The trial court then allowed the use of the videotaped deposition at trial but told the state it would have to represent at trial that

---

[2]*See supra* p. 2 n.1.

Demarco was an unavailable witness. At trial, following Zeph's testimony, the state requested permission to play the videotaped deposition to the jury, stating: "Your Honor, with the finding of unavailability, we would play [the videotaped deposition], Your Honor." The trial court told the jury to give Demarco "the same weight you would give [him] if [Demarco] was here testifying in person." The videotaped deposition was played to the jury.

****

Appellant challenges the use of Demarco's videotaped deposition at trial on the ground that the state failed to prove at trial that Demarco was an unavailable witness.

We note that appellant did not object to the use of the deposition during trial and specifically did not object when, before it played the deposition, the state stated: "Your Honor, *with the finding of unavailability*, we would play [the videotaped deposition], your Honor." (Emphasis added.) As such, the issue is waived absent a showing of plain error.... Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice.... We find no plain error.

We fail to see how the use of Demarco's videotaped deposition "rendered the trial fundamentally unfair and greatly prejudiced [appellant]." Appellant, along with Teray, Tyrone, and Terry, was physically present at Demarco's videotaped deposition. Likewise, all four defense attorneys, and thus appellant's attorney, were physically present at Demarco's deposition; all four attorneys cross-examined Demarco following the state's direct examination. Although it was played during trial, the trial court did not allow the jury to have the videotaped deposition during their deliberations.

We therefore find that the trial court did not abuse its discretion in admitting Demarco's videotaped deposition instead of requiring him to testify in person....

(Doc. 7, Ex. 16, pp. 10-11) (citations and footnote omitted).

In the return of writ, respondent contends that petitioner has waived the claim alleged in Ground One because petitioner's trial counsel failed to object at trial to the admission of Demarco's videotaped deposition, and the Ohio Court of Appeals relied on that procedural default when it refused to review the claim except for "plain error" on direct appeal. (Doc. 7, Brief, pp. 10-15). Respondent's argument has merit.

10

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state defendant with federal constitutional claims must first fairly present those claims to the state courts for consideration before raising them in a federal habeas corpus action. *See* 28 U.S.C. § 2254(b)(1), (c); *see also Anderson v. Harless*, 459 U.S. 4, 6 (1982) (*per curiam*); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). A constitutional claim must be presented to the state's highest court in order to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990); *Leroy v. Marshall*, 757 F.2d 94, 97, 99-100 (6th Cir.), *cert. denied*, 474 U.S. 831 (1985). If the petitioner fails to do so, he may have waived the claim for purposes of federal habeas corpus review. *See Weaver v. Foltz,* 888 F.2d 1097, 1099 (6th Cir. 1989).

It is well-settled that under the procedural default doctrine, the federal habeas court may be barred from considering an issue of federal law from a judgment of a state court if the judgment rests on a state-law ground that is both "independent" of the merits of the federal claim and an "adequate" basis for the state court's decision. *Harris v. Reed,* 489 U.S. 255, 260-62 (1989). The Supreme Court has stated:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default, and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Such a default may occur if the state prisoner files an untimely appeal, *Coleman*, 501 U.S. at 750, if he fails to present an issue to a state appellate court at his only opportunity to do so, *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994), or if he fails to

11

comply with a state procedural rule that required him to have done something at trial to preserve the

issue for appellate review, *e.g.*, to make a contemporaneous objection or to move for a directed

verdict. *United States v. Frady*, 456 U.S. 152, 167-69 (1982); *Simpson v. Sparkman*, 94 F.3d 199,

202 (6th Cir. 1996).

    The Sixth Circuit applies a four-part test to determine if a claim is procedurally defaulted:

> (1) the court must determine that there is a state procedural rule that is applicable to
> the petitioner's claim and that the petitioner failed to comply with the rule; (2) the
> court must determine whether the state courts actually enforced the state procedural
> sanction; (3) it must be decided whether the state procedural forfeiture is an adequate
> and independent state ground upon which the state can rely to foreclose review of a
> federal constitutional claim; and (4) if the court has determined that a state
> procedural rule was not complied with and that the rule was an adequate and
> independent state ground, then the petitioner is required to demonstrate that there was
> cause for him not to follow the procedural rule and that he was actually prejudiced
> by the alleged constitutional error.

*Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001) (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th

Cir. 1986)).

    The adequate and independent state ground doctrine will not apply to bar consideration of

a federal claim on habeas corpus review unless the last state court rendering a judgment in the case

"clearly and expressly" states that its judgment rests on a state procedural bar. *Harris,* 489 U.S. at

263; *see also Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000) (citing *Ylst v. Nunnemaker*, 501

U.S. 797, 803 (1991); *Couch v. Jabe*, 951 F.2d 94, 96 (6th Cir. 1991)).[3]  In cases where the last state

court to render a reasoned opinion on the claim explicitly relies on such a procedural bar, the court

---

[3]In *Harris,* the Supreme Court noted that the rule requiring that the state court plainly state that its judgment
rests on a state procedural default "applies only when a state court has been presented with the federal claim" raised
by the state prisoner as a ground for federal habeas relief. *Harris,* 489 U.S. at 263 n.9; *see also Teague v. Lane*, 489
U.S. 288, 299 (1989) (plurality opinion) ("The rule announced in *Harris* ... assumes that a state court has had the
opportunity to address a claim that is later raised in a federal habeas proceeding."). The *Harris* Court further noted:
"Of course, a federal habeas court need not require that a federal claim be presented to a state court if it is clear that
the state court would hold the claim procedurally barred." *Harris,* 489 U.S. at 263 n.9.

12

will presume that a later unexplained order did not silently disregard the procedural default and consider the merits of the claim. *Ylst,* 501 U.S. at 803-04.

In addition, the rule precluding federal habeas corpus review of claims rejected by the state courts on state procedural grounds applies only in cases where the state procedural bar is deemed "adequate" or, in other words, involves a "firmly established and regularly followed state practice" at the time that it was applied. *Ford v. Georgia,* 498 U.S. 411, 423-24 (1991); *Richey v. Mitchell,* 395 F.3d 660, 679 (6th Cir.) (citing *White v. Schotten,* 201 F.3d 743, 751 (6th Cir.), *cert. denied,* 531 U.S. 940 (2000)), *rev'd on other grounds,* 546 U.S. 74 (2005) (*per curiam*); *Warner v. United States,* 975 F.2d 1207, 1213 (6th Cir. 1992), *cert. denied,* 507 U.S. 932 (1993). To be considered regularly followed, a procedural rule need not be applied in every relevant case, but rather "[i]n the vast majority of cases." *Dugger v. Adams,* 489 U.S. 401, 410 n.6 (1989); *see also Byrd v. Collins,* 209 F.3d 486, 521 (6th Cir. 2000), *cert. denied,* 531 U.S. 1082 (2001).

Finally, the state court's adequate and independent finding of procedural default will preclude habeas corpus review of a federal claim, unless the petitioner can show "cause" for the default and "prejudice" as a result of the alleged violation of federal law, or demonstrate that failure to consider the federal claim will result in a "fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750; *Harris,* 489 U.S. at 262; *see also Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Engle v. Isaac,* 456 U.S. 107, 129 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

In the instant case, petitioner committed a procedural default by failing to object at trial when the prosecutor requested and was granted permission to use Demarco's videotaped deposition in lieu of the witness's live testimony. As respondent has pointed out in the return of writ (Doc. 7, Brief, p. 11), at a hearing held on February 6, 2008, five days before the trial commenced, the trial court

13

accepted the prosecutor's representation and physician's affidavit "that this witness is unable to attend [the trial] because of ... the degree of his sickness," but emphasized in closing: "I'm ... assuming that you [the prosecutor] make the same representations at trial because Monday is a different day than Wednesday. I still think you have to make that record at the time of trial that the witness is an unavailable witness." (Doc. 7, February 6, 2008 Motion to Suppress Hearing Tr. 8, 13). Six days later, during the trial, when the prosecutor was allowed to play Demarco's videotaped deposition marked as Exhibit 64 to the jury, neither petitioner's counsel nor any of the three co-defendants' attorneys, objected when the prosecutor stated only: "Your Honor, with the finding of unavailability, we would play Exhibit 64." (*See* Doc. 7, Trial Tr. 283-84).

The Ohio Court of Appeals was the only state court to issue a reasoned opinion addressing petitioner's claim challenging the admission of the videotaped deposition on the ground that the prosecutor failed to make the requisite showing of the witness's unavailability at the time of trial. In overruling the assignment of error, the court clearly and expressly stated that because petitioner "did not object to the use of the deposition during trial," and more specifically, did not object when the prosecutor explicitly referred to the "finding of unavailability" before playing the videotape to the jury, the "issue is waived absent a showing of plain error." (Doc. 7, Ex. 16, p. 11).

Under Ohio law, the failure to assert a contemporaneous objection to a perceived error occurring at trial constitutes a procedural bar to review of the error on direct appeal. *Scott v. Mitchell*, 209 F.3d 854, 866 (6th Cir.) (citing Ohio R. Crim. P. 52; *State v. Williams*, 364 N.E.2d 1364 (Ohio 1977) (citations omitted), *judgment vacated in part on other grounds,* 438 U.S. 911 (1978)), *cert denied*, 531 U.S. 1021 (2000). Ohio courts, however, may perform a limited review of the record to ensure that the alleged error does not amount to a "plain error" affecting a substantial

14

right. Ohio R. Crim. P. 52(B); *State v. Ballew*, 667 N.E.2d 369, 379 (Ohio 1996), *cert. denied,* 519

U.S. 1065 (1997). The primary issue to be determined on plain-error review is whether the outcome

of the trial clearly would have been different without the error. *State v. Braden*, 785 N.E.2d 439, 452

(Ohio 2003) (citing *State v. Long*, 372 N.E.2d 804 (Ohio 1978), paragraph two of the syllabus). In

reviewing for plain error, the state appellate court here determined that petitioner was not denied a

fair trial. (Doc. 7, Ex. 16, pp. 11-12).

      The undersigned finds that the Ohio Court of Appeals enforced an adequate and independent

state procedural bar when it reviewed petitioner's claim for "plain error" only. The state appellate

court's clear and explicit finding that petitioner had waived the issue by failing to lodge an objection

at trial rested on a "firmly established and regularly followed state practice" at the time the

procedural bar was applied. *Cf. Keith v. Mitchell,* 455 F.3d 662, 673 (6th Cir. 2006) (citing *Scott,*

209 F.3d at 866, as "recognizing [that] Ohio's contemporaneous objection rule [is] an adequate and

independent state ground"), *cert. denied,* 549 U.S. 1308 (2007); *see also Mason v. Mitchell,* 320 F.3d

604, 635 (6th Cir. 2003); *Hinkle v. Randle,* 271 F.3d 239, 244 (6th Cir. 2001). Moreover, the

court's review solely for "plain error" based on its determination that the claim was otherwise

"waived" does not constitute a waiver or non-enforcement of the state procedural bar by the

reviewing court. *See, e.g., Mason,* 320 F.3d at 635 (quoting *Hinkle,* 271 F.3d at 244) ("[W]e view

a state appellate court's review for plain error as the enforcement of a procedural default."); *see also*

*White v. Mitchell*, 431 F.3d 517, 525 (6th Cir. 2005), *cert. denied,* 549 U.S. 1034, 1047 (2006);

*Seymour v. Walker,* 224 F.3d 542, 557 (6th Cir. 2000) (citing *Paprocki v. Foltz,* 869 F.2d 281, 284-

85 (6th Cir. 1989)), *cert. denied,* 532 U.S. 989 (2001).

      The Ohio Supreme Court's subsequent unexplained decision declining jurisdiction to hear

the case and dismissing petitioner's appeal for lack of a substantial constitutional question must be presumed to rely on the same procedural default. *See Ylst,* 501 U.S. at 803-04; *cf. Taqwiim v. Johnson,* 229 F.3d 1154 (table), No. 99-3425, 2000 WL 1234322, at **3 (6th Cir. Aug. 22, 2000) (unpublished) (citing *Ylst* and *Levine v. Torvik,* 986 F.2d 1506, 1517 n.8 (6th Cir.), *cert. denied,* 509 U.S. 907 (1993), and *overruled in part on other grounds by Thompson v. Keohane,* 516 U.S. 99 (1995)), *cert. denied,* 531 U.S. 1089 (2001).

Because petitioner failed to comply with an adequate and independent state procedural rule that was enforced by the state courts on appellate review, the claim alleged in Ground One of the petition is barred from review in this federal habeas proceeding absent a showing of cause and prejudice or that a "fundamental miscarriage of justice" will result if the claim is not considered herein. *See Mason,* 320 F.3d at 635; *see also Coleman,* 501 U.S. at 750; *Harris,* 489 U.S. at 262; *Murray,* 477 U.S. at 485.

Here, petitioner has not provided any justification as "cause" for his procedural default in the state courts. He also has not demonstrated that failure to consider the defaulted claim will result in a "fundamental miscarriage of justice," or in other words, that the alleged error "probably resulted in the conviction of one who is actually innocent." *See Murray,* 477 U.S. at 495-96; *see also Schlup v. Delo,* 513 U.S. 298, 327 (1995).

Therefore, petitioner has waived the claim alleged in Ground One of the petition. The claim is barred from review and should be dismissed with prejudice.

## B. Petitioner Is Not Entitled To Relief Based On The Claim In Ground Two Alleging That The Trial Court Erred Under Ohio Law In Admitting A Photograph Into Evidence

In Ground Two of the petition, petitioner alleges that the trial court abused its discretion and

16

violated Ohio R. Evid. 403(A) when it allowed the State to introduce into evidence, over his objection, a photograph which showed him "wearing a handgun in a shoulder holster." (Doc. 1, p. 3). Specifically, as he argued on direct appeal in the state courts (*see* Doc. 7, Ex. 14, pp. 4-5; Ex. 18, p. 6), petitioner contends that the trial court erred because under the standard set forth in Rule 403(A), "any minimal probative value" of the photograph was "far outweigh[ed]" by its "prejudicial effect." (Doc. 1, p. 3).

As an initial matter, the Court is precluded from reviewing Ground Two to the extent petitioner contends he is entitled to relief because the trial court abused its discretion or otherwise erred under Ohio R. Evid. 403 in refusing to sustain his objection to the photograph. A federal court may review a state prisoner's habeas petition only on the ground that the challenged confinement violates the Constitution, laws or treaties of the United States, and not "on the basis of a perceived error of state law." 28 U.S.C. § 2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *see also Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions"). The federal habeas court has authority to consider only whether the alleged error violated petitioner's federal constitutional right to due process. However, it appears petitioner has waived the constitutional claim because he failed to present the federal issue to the Ohio courts.[4]

As discussed above in addressing petitioner's procedural default of Ground One, *see supra*

---

[4]Although respondent has not argued in the return of writ that any federal constitutional issue raised in Ground Two is subject to dismissal on waiver grounds, the Court *sua sponte* may consider the question. *See, e.g., Lorraine v. Coyle,* 291 F.3d 416, 426 (6th Cir.), *as corrected on denial of rehearing by* 307 F.3d 459 (6th Cir. 2002), *cert. denied,* 538 U.S. 947 (2003); *see also Palmer v. Bagley,* 330 Fed. Appx. 92, 105-06 (6th Cir. 2009), *cert. denied,* 130 S.Ct. 1737 (2010). Petitioner will have the opportunity to address the issue by way of objections to this Report and Recommendation before the District Court enters a final Order disposing of the case. *Cf. Palmer,* 330 Fed. Appx. at 105.

pp. 10-11, a state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas corpus action. 28 U.S.C. § 2254(b), (c); *Anderson v. Harless,* 459 U.S. 4, 6 (1982) (*per curiam*); *Picard v. Connor,* 404 U.S. 270, 275-76 (1971). It is well-settled that in order to satisfy the "fair presentation" requirement, the habeas petitioner must present both the factual and legal underpinnings of his claims to the state courts. *McMeans v. Brigano,* 228 F.3d 674, 681 (6th Cir. 2000), *cert. denied,* 532 U.S. 958 (2001); *Franklin v. Rose,* 811 F.2d 322, 325 (6th Cir. 1987). This means the petitioner must present his claims to the state courts as federal constitutional issues and not merely as issues arising under state law. *Franklin,* 811 F.2d at 325 (citing *Koontz v. Glossa,* 731 F.2d 365, 368 (6th Cir. 1984)); *see also Prather v. Rees,* 822 F.2d 1418 (6th Cir. 1987).

A set of four guidelines has been developed for determining whether a claim was presented in such a way as to alert the state courts of the claim's federal nature. *McMeans,* 228 F.3d at 681. Under those guidelines, the fair presentation requirement is satisfied if the petitioner raised the federal issue in the state courts by (1) relying on federal cases employing constitutional analysis; (2) relying on state cases employing constitutional analysis in similar factual contexts; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law. *Id.*; *Franklin,* 811 F.2d at 326 (quoting *Daye v. Attorney General of New York,* 696 F.2d 186,193-94 (2nd Cir. 1982) (*en banc*)).

The use of a "generalized catch-all phrase," which merely alleges the denial of a fair trial under the United States Constitution, does not adequately alert the state courts of the constitutional nature of the claim where the "only legal theory presented to the state courts was predicated entirely

18

upon state evidentiary law." *Franklin,* 811 F.2d at 326. "While a petitioner need not cite chapter and verse of constitutional law, general allegations of the denial of rights to a fair trial and due process do not fairly present claims that specific constitutional rights were violated." *Slaughter v. Parker,* 450 F.3d 224, 236 (6th Cir. 2006) (internal citations and quotations omitted), *cert. denied,* 551 U.S. 1103 (2007). Generally, a claim is not fairly presented to a state court "if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese,* 541 U.S. 27, 32 (2004).

In this case, petitioner failed to fairly present to the Ohio appellate courts any federal due process claim stemming from the state-law error alleged in Ground Two of the petition. In both his brief on appeal to the Ohio Court of Appeals and his memorandum in support of jurisdiction to the Ohio Supreme Court, petitioner relied solely on standards set forth in Ohio R. Evid. 403(A) in arguing that the trial court had abused its discretion. Therefore, the only legal theories presented to and considered by the state courts were predicated entirely on state law.[5]

By thus failing to provide the Ohio courts with an opportunity to correct any error of constitutional dimension which may have arisen from the trial court's evidentiary ruling, petitioner has waived the federal issue unless he demonstrates cause for his default and actual prejudice as a

---

[5]A state appellate court deciding whether a trial court abused its discretion or otherwise committed prejudicial error under state law faces a different legal question than a state court deciding whether such error amounted to a constitutional due process violation. *Harsh v. Warden, Chillicothe Corr. Inst.,* 1:08cv433, 2009 WL 3378246, at *1, *7 (S.D. Ohio Oct. 15, 2009) (Beckwith, J.; Black, M.J.) (unpublished) (citing *Petrucelli v. Coombe,* 735 F.2d 684, 690 (2nd Cir. 1984), and *Steele v. Taylor,* 684 F.2d 1193, 1206 (6th Cir. 1982), *cert. denied,* 460 U.S. 1053 (1983)). In this case, the Ohio Court of Appeals was the only state appellate court that issued a reasoned decision addressing petitioner's claim on the merits. Because the court was not made aware of any constitutional concerns, it considered and determined the issues as argued by petitioner, solely in terms of state law – *i.e.,* concluding that the trial court did not abuse its discretion or otherwise err in its application of Ohio R. Evid. 403 in allowing the photograph to be admitted into evidence. (*See* Doc. 7, Ex. 16, pp. 12-14).

19

result of the alleged error, or that failure to consider the constitutional claim will result in a "fundamental miscarriage of justice." *See Coleman,* 501 U.S. at 750; *see also Murray,* 477 U.S. at 485; *Isaac,* 456 U.S. at 129; *Sykes,* 433 U.S. at 87. No such showing has been made in this case.

Accordingly, in sum, petitioner is not entitled to habeas corpus relief based on his claim in Ground Two challenging the trial court's decision to admit the allegedly prejudicial photograph into evidence because: (1) his claim is not cognizable to the extent he alleges the trial court abused its discretion or otherwise erred under Ohio law; and (2) petitioner has waived any claim of federal constitutional error because he failed to fairly present the federal issue to the state courts.

## C. Ground Three, Challenging The Sufficiency Of Evidence Supporting Petitioner's Felonious Assault Conviction With Firearm Specification, Lacks Merit

In Ground Three of the petition, petitioner alleges that the evidence presented at trial was insufficient to support his conviction for felonious assault with firearm specification. (Doc. 1, pp. 3-4). It appears from the record that petitioner was convicted for his role in the shooting and wounding of victim Demarco Conley. (*See* Doc. 7, Ex. 14, pp. 6-7; Ex. 16, p. 14; Ex. 18, pp. 7-8). As he argued on appeal in the state courts (*see* Doc. 7, Ex. 14, pp. 6-7; Ex. 18, pp. 7-8), petitioner contends that he is entitled to habeas relief because "no direct testimony" was presented that he shot and wounded Demarco; Demarco testified that he was not sure who shot him; and one of the State witnesses admitted at trial that he would lie to help Demarco. (Doc. 1, pp. 3-4).

The Ohio Court of Appeals was the last state court to render a reasoned decision addressing the merits of petitioner's sufficiency-of-evidence claim. In overruling the assignment of error, the state appellate court made factual findings, which are presumed to be correct under 28 U.S.C. §

20

Case: 1:09-cv-00693-SJD-KLL Doc #: 21 Filed: 12/02/10 Page: 21 of 31  PAGEID #: 1037

2254(e)(1),[6] and reasoned in relevant part as follows:

> "In reviewing a claim of insufficient evidence, '[t]he relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'"... A reviewing court must not substitute its evaluation of the witnesses' credibility for that of the jury's....

> Further, circumstantial evidence and direct evidence have the same probative value; in some instances, certain facts can only be established by circumstantial evidence.... A conviction based on circumstantial evidence is no less sound than one based on direct evidence....

> Appellant was convicted of felonious assault, in violation of R.C. 2903.11(A)(2), which states: "No person shall knowingly *** cause or attempt to cause physical harm to another *** by means of a deadly or dangerous ordnance." The jury further found appellant "did have, or aided or abetted another who had a firearm on or about his person or control and either displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm or used it to facilitate the offense." *See* R.C. 2941.145(A).

> In the early morning hours of September 19, 2007, Demarco was involved in a fight at the bar with a friend of Teray. After the fight, Demarco drove to the projects to recruit friends to go finish the fight at the bar. At the project, either during or after the beating of Deontae, D[ometrice] observed a silver Nissan vehicle driven by appellant drive on McGuire Street before turning on Vance Street. Teray was in the front passenger seat.... The car was recovered later that day on Vance Street. It was rented to appellant.

> Soon after the vehicle turned onto Vance Street, gunfire erupted: D[ometrice] and James saw Teray come around the corner from Vance Street and start shooting while walking down McGuire Street. According to James, Teray was with two other persons....

> Demarco was shot in the grassy area near Main Street and fell to the ground. After seeing Demarco being shot and falling to the ground, James observed Teray, who was with appellant, hit Demarco with a weapon. Appellant then told Teray: "Here come the police. Come on." Although James did not know who shot Demarco, he observed appellant and Teray each with a weapon. Appellant's weapon was bigger than a handgun and was shooting rapidly. According to James, (1) both appellant and Teray were shooting when James was in the grassy area; and (2) appellant was

---

[6]*See supra* p. 2 n.1.

21

running towards Demarco and shooting when the latter was shot.... James, a friend of Demarco, testified he would lie for Demarco but had no reason to lie in the case at bar.

On direct examination, Demarco testified that while hiding behind a shed, he saw appellant and Teray chase Jeremy. Demarco yelled; appellant and Teray turned towards him and started shooting; Demarco "got hit;" he was in the grassy area near Main Street. Someone then came to him and smacked him with a gun, stating "You're going to die bitch ass n***." Demarco recognized Teray's voice. Another individual with Teray told Teray "to come on because the police was coming." ...

On cross-examination, Demarco testified that he believed appellant and Teray were the two shooters chasing Jeremy but could not be positive; he did not know if he was shot by appellant, Teray, or both; he was hit once and the bullet was still in his body; and he was not sure who the person who came to him was. Demarco also testified appellant and Teray both had weapons when they were chasing Jeremy.

At the scene, 9 mm and .40 caliber shell casings were recovered. After appellant was arrested, a search of his apartment yielded one .40 caliber bullet and two bullet proof vest carriers without their panels but each with a holster of a different size. A photograph showed appellant wearing a shoulder-type holster with what appeared to be a TEC-9 weapon. Monturo testified a TEC-9 weapon uses 9 mm bullets.

While much of the evidence against appellant is circumstantial, viewing this evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could find that the elements of the felonious assault offense were proved beyond a reasonable doubt. Accordingly, we find sufficient evidence to support appellant's conviction for felonious assault with a firearm specification.

(Doc. 7, Ex. 16, pp. 14-17) (state case citations omitted).

In this federal habeas case, the applicable standard of review governing the adjudication of

the constitutional claim addressed on the merits by the Ohio Court of Appeals is set forth in 28

U.S.C. § 2254(d). Under that provision, a writ of habeas corpus may not issue with respect to any

claim adjudicated on the merits by the state courts unless the adjudication either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

A legal principle is "clearly established" for purposes of habeas corpus review "only when it is embodied in a holding of [the Supreme] Court." *Thaler v. Haynes,* 130 S.Ct. 1171, 1173 (2010). "[A] federal habeas court reviewing the state-court judgment must apply the law that controlled 'at the time his state-court conviction became final.'" *Miller v. Stovall,* 608 F.3d 913, 919 (6th Cir. 2010) (quoting *Williams v. Taylor,* 529 U.S. 362, 390 (2000)).

In addition, the "contrary to" and "unreasonable application" clauses set forth in 28 U.S.C. § 2254(d)(1) have independent meanings:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts... The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of a particular case.... The focus on the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and ... an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694 (2002) (citation omitted). Under § 2254(d)(1)'s "unreasonable application" clause, the writ may issue only if the application is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." *McGhee v. Yukins,* 229 F.3d 506, 510 (6th Cir. 2000) (citing *Williams,* 529 U.S. at 412).

The Supreme Court precedent setting forth the clearly-established federal legal principles applicable to the case-at-hand is *Jackson v. Virginia,* 443 U.S. 307 (1979). The Due Process Clause

requires the State to prove beyond a reasonable doubt every fact necessary to constitute the charged offense. *In Re Winship,* 397 U.S. 358, 363-64 (1970). When a petitioner raises a sufficiency-of-evidence claim in a petition for a writ of habeas corpus, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319 (emphasis in original).

As the Supreme Court explained in *Jackson*, the State is not required under the Due Process Clause to rule out every hypothesis except that of guilt beyond a reasonable doubt. *Id.* at 326. Rather, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.*; *see also Walker v. Engle,* 703 F.2d 959, 969-70 (6th Cir.), *cert. denied,* 464 U.S. 951, 962 (1983). It is the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence and to draw reasonable inferences from the evidence. *Jackson,* 443 U.S. at 319. Consequently, the reviewing court is not permitted to make its own subjective determination of guilt or innocence or otherwise substitute its opinion for that of the jury which convicted the petitioner. *Id.* at 318-19 & n.13; *see also York v. Tate,* 858 F.2d 322, 329 (6th Cir. 1988) (*per curiam*), *cert. denied,* 490 U.S. 1049 (1989).

"Circumstantial evidence alone is sufficient to support a conviction." *Newman v. Metrish,* 543 F.3d 793, 796 (6th Cir. 2008) (quoting *Johnson v. Coyle,* 200 F.3d 987, 992 (6th Cir. 2000)), *cert. denied,* 130 S.Ct. 1134 (2010). Due process is satisfied as long as such evidence is enough for a rational trier of fact to make a permissible *inference* of guilt, as opposed to a reasonable

24

*speculation* that the petitioner is guilty of the charged crime. *Id.* at 796-97 (and Sixth Circuit cases cited therein).

In the instant case, although the Ohio Court of Appeals cited only Ohio cases, it correctly identified and applied the *Jackson* standard of review in addressing petitioner's sufficiency-of-evidence claim. (*See* Doc.7, Ex. 16, p. 14). Upon review of the trial transcript, this Court concludes that the state appellate court's adjudication of the claim involved a reasonable application of the *Jackson* standard and was based on a reasonable determination of the facts in light of the evidence presented at trial.

Apparently because it was difficult, if not impossible, to ascertain who actually shot the victims during the shootout, petitioner and his three co-defendants were prosecuted based on the theory that they acted either as principals or in complicity with other co-defendants. (*See* Doc. 7, Trial Tr. 652-62). With respect to the specific count charging petitioner with felonious assault, the court instructed the jury that "[b]efore you can find [petitioner] guilty [on Count Four of the indictment], you must find beyond a reasonable doubt that ... [he] did knowingly cause or attempt to cause, *or aided and abetted another in causing or attempting to cause* physical harm to another by means of a deadly weapon or dangerous ordnance." (Doc. 7, Trial Tr. 660) (emphasis added). The court further instructed the jury that "[i]f your verdict is guilty [on Count Four], you will separately decide beyond a reasonable doubt if the defendant, *or a person whom the defendant aided and abetted while committing felonious assault*, had a firearm on or about the offender's person or under the offender's control while committing the offense and either displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm or used it to facilitate the offense." (Doc. 7, Trial Tr. 660-61) (emphasis added).

25

Under Ohio's complicity statute, "[n]o person, acting with the kind of culpability required

for the commission of an offense, shall ... [a]id or abet another in committing the offense." Ohio

Rev. Code § 2923.03(A)(2). The mere presence of the accused at the scene of the crime is

insufficient, in and of itself, to prove guilt as an aider and abettor. *State v. Johnson,* 754 N.E.2d 796,

799 (Ohio 2001) (quoting *State v. Widner,* 431 N.E.2d 1025, 1027 (Ohio 1982)). Rather, "[t]he

requisite culpability for an accomplice to a crime mirrors the culpability required for the underlying

offense." *Johnson v. Hall,* 290 Fed. Appx. 848, 853 (6th Cir. 2008) (citing *State v. Rice,* 659 N.E.2d

826, 834 (Ohio Ct. App.), *appeal dismissed,* 655 N.E.2d 184 (Ohio 1995)).

The Ohio Supreme Court has held:

> [T]o support a conviction for complicity by aiding and abetting pursuant to R.C.
> 2923.03(A)(2), the evidence must show that the defendant supported, assisted,
> encouraged, cooperated with, advised, or incited the principal in the commission of
> the crime, and that the defendant shared the criminal intent of the principal. Such
> intent may be inferred from the circumstances surrounding the case.

*Johnson,* 754 N.E.2d at 801; *see also Hawkins v. Ganshimer,* 286 Fed. Appx. 896, 903 (6th Cir.

2008). The defendant's "[p]articipation in criminal intent may be inferred from [his] presence,

companionship and conduct before and after the offense is committed." *Johnson,* 754 N.E.2d at 801

(quoting *State v. Pruett,* 273 N.E.2d 884, 887 (Ohio Ct. App. 1971)).

Here, a review of the record reveals that the State presented sufficient evidence to establish

petitioner's guilt as an accomplice, if not as a principal, for the felonious assault offense charged in

Count Four. A rational juror could infer from the testimony of eyewitnesses at the scene of the

shootout that petitioner was present and actively participated as one of the four individuals who not

only shot at Demarco, but also at others who were wounded while running to flee the scene.

Specifically, testimony was elicited at trial from which a reasonable juror could infer that

26

petitioner arrived at the scene with co-defendants Teray Marshall and Terry Fuller, as the driver of the silver Nissan later found parked on Vance Street, which passed by the four victims and Dometrice Davis, James Wilson and Zeph Jennings while they were standing together on McGuire Street moments before the shootout began. (*See* Doc. 7, Trial Tr. 91, 95-96, 127-28, 141, 162, 193).[7]  A reasonable juror also could infer that petitioner was one of the people seen with Teray when Teray "[came] around the corner off Vance onto McGuire" holding a gun, which he proceeded to fire at the group standing by a dumpster. (Doc. 7, Trial Tr. 97-98, 187-88, 197, 209).

Petitioner does not dispute that Demarco testified in his videotaped deposition that while he was hiding behind a shed in the grassy area, he observed Jeremy McGuire, who had been shot in the hand, "being chased and fired at by two people," whom Demarco believed were petitioner and Teray. (*See* Doc. 7, Ex. 16, p. 5). Demarco further testified that he came out of hiding to distract the shooters, who then "turned towards him" firing their weapons, which is when he was shot in the stomach and fell to the ground. Demarco stated that he recognized Teray's voice when he was "smacked ... with a gun" after falling to the ground, and that another person told Teray to "come on because police was coming." (Doc. 7, Ex. 16, p. 5).

Demarco's observations were corroborated by James Wilson, who testified that he saw "what happened to Demarco." (Doc. 7, Trial Tr. 190). James said he saw petitioner with Teray when Demarco was shot, and that petitioner had a "firearm in his hand" which was "bigger than [a] handgun." (Doc. 7, Trial Tr. 189, 192-93, 199, 209-10, 239-40). James also observed petitioner and Teray go up to Demarco after Demarco fell to the ground; that Teray hit Demarco with a gun; and that

---

[7]Dometrice Davis testified that he saw petitioner and Teray in the car, as well as another person who was wearing an orange shirt. (Doc. 7, Trial Tr. 96). James Wilson testified that he saw Jerrel Wright get shot by a person in an orange shirt. (Doc. 7, Trial Tr. 191-93). Zeph Jennings testified that he was shot at by a "person in orange." (Doc. 7, Trial Tr. 279). Lori Glover testified that she saw Terry Fuller earlier in the evening at the bar where the fight broke out between Demarco and Teray's friend, Brandon Smiley; Fuller was wearing a "[b]right orange T-shirt." (Doc. 7, Trial Tr. 545). In light of this testimony, a rational juror could infer that Fuller was the third person in the Nissan with petitioner and Teray and also participated in the shootout.

27

petitioner then told Teray: "Here come the police. Come on." (Doc. 7, Trial Tr. 190-91). Dometrice Davis provided additional corroborating testimony to the extent that during the shootout, when he was hiding behind a shed in the grassy area, he saw petitioner near where Demarco was shot. (*See* Doc. 7, Trial Tr. 168-74).

Viewing all the evidence in the light most favorable to the prosecution, the Court concludes that a rational juror could have found beyond a reasonable doubt that petitioner knowingly caused or attempted to cause, or aided and abetted another in causing or attempting to cause, physical harm to another by means of a deadly weapon or dangerous ordnance. A rational juror also could have found beyond a reasonable doubt that petitioner was guilty on the firearm specification for displaying, brandishing, or using a firearm to facilitate the offense.

Accordingly, in sum, petitioner is not entitled to relief based on the claim alleged in Ground Three of the petition challenging the sufficiency of evidence.

## IT IS THEREFORE RECOMMENDED THAT:

1. Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** with prejudice.

2. A certificate of appealability should not issue with respect to claims alleged in Grounds One and Two of the petition, which this Court has concluded are waived and thus barred from review on procedural grounds, because "jurists of reason would not find it debatable as to whether this Court is correct in its procedural rulings]" under the first prong of the applicable two-part standard enunciated by the Supreme Court in *Slack v. McDonnell,* 529 U.S. 473, 484-85 (2000).[8]

---

[8]Because the Court finds that a certificate of appealability is unwarranted under the first prong of the *Slack* standard, it need not address the second prong of *Slack* as to whether or not "jurists of reason" would find it debatable whether any of the defaulted grounds for relief state a viable constitutional claim. *See Slack,* 529 U.S. at

A certificate of appealability also should not issue with respect to the state-law claim alleged in Ground Two of the petition, as well as the sufficiency-of-evidence claim alleged in Ground Three which was addressed on the merits herein, because petitioner has failed to make a substantial showing of the denial of a constitutional right in those grounds for relief. *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3. With respect to any application by petitioner to proceed on appeal *in forma pampers,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and therefore **DENY** petitioner leave to appeal *in forma pampers* upon a showing of financial necessity. *See* Fed. R. App. P. 24(a); *Chanced v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

Date: 12/2/2010

Karen L. Litkovitz
United States Magistrate Judge

cbc

---

484. The Court notes, however, with respect to the claim alleged in Ground One challenging the admission of Demarco's videotaped deposition, that there is evidence in the record suggesting that the witness was physically incapable of testifying in person at petitioner's trial. (*See* Doc. 7, Trial Tr. 543).

29

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

SHADEED BARNETT,                                    Civil Action No. 1:09-cv-693
      Petitioner,

                                                   Dlott, C.J.
  vs.                                              Litkovitz, M.J.

WARDEN, CHILLICOTHE CORRECTIONAL
INSTITUTION,
      Respondent.

### NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **within 14 days** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **within 14 days** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).

| SENDER: *COMPLETE THIS SECTION* | | *COMPLETE THIS SECTION ON DELIVERY* | |
|---|---|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | | A. Signature<br><br>X | ☑ Agent<br>☐ Addressee |
| | | B. Received by ( *Printed Name* ) | C. Date of Delivery |
| 1. Article Addressed to:<br><br>Shadeed Barnett A 575-136<br>Chillicothe Corr. Inst.<br>PO Box 5500<br>Chillicothe, OH 45601 | | D. Is delivery address different from item 1? ☐ Yes<br>If YES, enter delivery address below: ☐ No | |
| | | 3. Service Type<br>☑ Certified Mail ☐ Express Mail<br>☐ Registered ☐ Return Receipt for Merchandise<br>☐ Insured Mail ☐ C.O.D. | |
| | | 4. Restricted Delivery? *(Extra Fee)* | ☐ Yes |
| 2. Article Number<br>*(Transfer from service label)* | 7002 3150 0000 8388 3608 | | |
| PS Form 3811, August 2001 | Domestic Return Receipt | | 102595-02-M-1540 |

1:09 cv 693   (Doc. 21)